Daniel Cooper (Bar No. 153576)
Drevet Hunt (Bar No. 240487)
Caroline Koch (Bar No. 266068)
LAWYERS FOR CLEAN WATER, INC.
1004-A O'Reilly Avenue
San Francisco, California 94129
Telephone: (415) 440-6520
Facsimile: (415) 440-4155
Email: daniel@lawyersforcleanwater.com

Christopher Sproul (Bar No. 126398)
Environmental Advocates
5135 Anza Street
San Francisco, California 94121
Telephone: (415) 533-3376
Facsimile: (415) 358-5695
Email: csproul@enviroadvocates.com

Attorneys for Plaintiff
SANTA BARBARA CHANNELKEEPER

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANTA BARBARA CHANNELKEEPER, a California non-profit corporation,<br><br>        Plaintiff,<br><br>v.<br><br>CITY OF SANTA BARBARA, a California municipal corporation,<br><br>        Defendants. | CASE NO. CV 11-03624 AGR<br><br>CONSENT DECREE |

CONSENT DECREE

The following Consent Decree is entered into by and between Plaintiff Santa Barbara Channelkeeper ("Plaintiff" or "Channelkeeper") and Defendant City of Santa Barbara ("Defendant" or "City").  The entities entering into this Consent Decree are each an individual "Party" and collectively "Parties."

WHEREAS, Channelkeeper is a non-profit public benefit corporation dedicated to, among other things, the protection and enhancement of the water quality of the Santa Barbara Channel;

WHEREAS, the City is a municipal corporation established by California state law;

WHEREAS, the City owns and operates a sewage collection system that serves the City of Santa Barbara ("City Collection System");

WHEREAS, the City Collection System is intended to convey sewage to the City of Santa Barbara's El Estero Wastewater Treatment Plant ("the EE WWTP");

WHEREAS, the City acknowledges its responsibility to maintain building laterals serving City buildings;

WHEREAS, the City operates a Municipal Separate Storm Sewer System;

WHEREAS, the City Collection System and the EE WWTP are regulated by the Federal Water Pollution Control Act, 33 U.S.C., §§ 1251 *et seq*. ("Clean Water Act" or "CWA") and are permitted under Regional Water Quality Control Board, Central Coast Region ("RWQCB") Order No. R3-2010-0011, NPDES Permit No. CA0048143 ("POTW Permit");

WHEREAS, the City's municipal separate storm sewer is regulated by the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq*. ("Clean Water Act" or "CWA") and is permitted under *Waste Discharge Requirements for Stormwater Discharges From Small Municipal Separate Storm Sewer Systems (General Permit)*, State Water Resources Control Board, Order No. 2003–0005–DWQ, NPDES Permit No. CAS000004 ("MS4 Permit");

1    WHEREAS, on February 24, 2011, Channelkeeper issued a sixty (60) day

2  notice letter ("Notice Letter") to the City.  The Notice Letter alleged violations of

3  the Clean Water Act, the POTW Permit, and the MS4 Permit for sanitary sewer

4  overflows ("SSOs") from the City Collection System and informed the City of

5  Channelkeeper's intention to file suit against the City.  The Notice Letter was sent to

6  the Administrator of the United States Environmental Protection Agency ("EPA"),

7  the Administrator of EPA Region IX, and the Executive Director of the State Water

8  Resources Control Board ("State Board"), as required by section 505(b)(1)(A) of the

9  Clean Water Act, 33 U.S.C. § 1365(b)(1)(A).  The Notice Letter was also sent to the

10  Executive Officer of the Regional Board;

11    WHEREAS, on April 27, 2011, Channelkeeper filed its complaint against the

12  City in the United States District Court for the Central District of California, Case

13  No. CV-11-03624 JHN (AGRx) (hereinafter "Complaint");

14    WHEREAS, on October 25, 2011, Channelkeeper issued a supplemental sixty

15  (60) day notice letter ("Supplemental Notice Letter").  The Supplemental Notice

16  Letter alleged violations of the Clean Water Act, the POTW Permit, and the MS4

17  Permit for alleged discharges of raw sewage from the City Collection System into

18  the MS4 via cracks, holes or other pipe defects, and of Channelkeeper's intention to

19  amend the Complaint to add these claims.  The Supplemental Notice Letter was sent

20  to the Administrator of the United States Environmental Protection Agency

21  ("EPA"), the Administrator of EPA Region IX, and the Executive Director of the

22  State Water Resources Control Board ("State Board"), as required by section

23  505(b)(1)(A) of the Clean Water Act, 33 U.S.C. § 1365(b)(1)(A).  The

24  Supplemental Notice Letter was also sent to the Executive Officer of the Regional

25  Board

26    WHEREAS, the City denies Channelkeeper's allegations that it has violated

27  the Clean Water Act or any permit and denies it has liability to Channelkeeper;

28    WHEREAS, the Parties, through their authorized representatives and without

CONSENT DECREE                                                      CV 11-03624 AGR

3

either adjudication of the Complaint's claims or admission by the City of any alleged violation or other wrongdoing, have chosen to resolve this action through settlement to avoid the costs and uncertainties of further litigation;

WHEREAS, the City has executed a Service Contract with Brown and Caldwell ("B&C") for Development of Wastewater Collection System Strategic Management Program – ("Phase I Agreement") dated January 11, 2011, to:

- Review and update the City's routine cleaning and Accelerated Cleaning Programs, including development of standardized procedures for cleaning and for reporting maintenance activities;

- Review and update the City's emergency SSO response program;

- Update the City's Computerized Maintenance Management Software ("CMMS") to implement improvements to the City's asset management program; and

- Link the City's CMMS to its Geographic Information System ("GIS");

WHEREAS, the City has also executed a Service Contract with B&C for Development of Wastewater System Strategic Management Program - ("Phase II Agreement") dated June 7, 2011, to:

- Develop a plan for inspecting and assessing the condition of Gravity Sewers;

- Develop a method for prioritizing future replacement, rehabilitation, and repair projects;

- Assess the condition of the City's pump stations and Force Mains and make recommendations for prioritizing needed repairs;

- Review and update the City's FOG program; and

- Update the City's current Sewer System Management Plan;

WHEREAS, this Consent Decree requires the City to continue its work with B&C to implement certain provisions set forth herein;

WHEREAS, all actions taken by the City pursuant to this Consent Decree will

be made in compliance with all applicable federal, state and local rules and regulations; and

**NOW THEREFORE IT IS HEREBY STIPULATED BETWEEN THE PARTIES AND ADJUDGED, ORDERED AND DECREED BY THE COURT AS FOLLOWS:**

## I. GENERAL OBJECTIVES

1.     The objectives of this Consent Decree are:

        a.     To ensure that the City uses, implements, and improves its ways, means, and methods to prevent SSOs;

        b.     To ensure that the City uses, implements, and improves its ways, means, and methods to comply with the Clean Water Act; and

        c.     To further the goals and objectives of the Clean Water Act.

## II. DEFINITIONS

2.     Unless otherwise expressly defined herein, terms used in this Consent Decree that are defined in the Clean Water Act or in regulations, or in rules promulgated under the Clean Water Act, have the meaning assigned to them in the applicable statutes, regulations, or rules.  Whenever terms listed below are used in this Consent Decree, the following definitions apply:

        a.     "10-Year 24-Hour Storm" means rainfall occurring over 24 hours with rainfall amounts, as measured by a properly calibrated rain gage that records hourly rain data within the City, maintained by the County of Santa Barbara Flood Control District and located at the Santa Barbara County Building, Station 234, expected to be equaled or exceeded every 10 years on average.

        b.     "Consent Decree" means this Consent Decree, and any exhibits incorporated by reference to this Consent Decree.

        c.     "Accelerated Cleaning Program" means the City's program to regularly clean Sewer Line Segments in the City Collection System that have been

CONSENT DECREE

CV 11-03624 AGR

1  identified, based on field observations, maintenance history, maintenance condition

2  findings, CCTV assessments or other information to have a risk of causing a

3  maintenance-related SSO.

4          d.    "CCTV" means closed-circuit television.

5          e.    "CIP" means the City's capital improvement plan for pipe repair,

6  replacement and rehabilitation and other capital projects for the City Collection

7  System, which is comprised of the Lift Station Maintenance Program and the

8  Sanitary Sewer Overflow Compliance Program and other projects as from time to

9  time may be added for collection system improvement.

10          f.    "City" means the City of Santa Barbara.

11          g.    "City Collection System" means the sewer pipes and lines,

12  manholes or maintenance holes, and all appurtenances thereto owned by the City

13  that are used to convey wastewater generated by residential, commercial, and

14  industrial sources to the EE WWTP.  For purposes of this Consent Decree, the City

15  Collection System does not include building laterals.

16          h.    "Day" means a calendar day.  In computing any period of time

17  under this Consent Decree, where the last day of such period is a Saturday, Sunday,

18  or Federal or State Holiday, the period runs until the close of business on the next

19  day that is not a Saturday, Sunday, or City or Federal or State Holiday.

20          i.    "Gravity Sewer" means pipes within the City Collection System

21  that convey wastewater by gravity flow.

22          j.    "FOG" means fats, oil, and grease.

23          k.    "Force Main" means the pipelines within the City Collection

24  System that convey wastewater under pressure from the discharge side of a pump or

25  pneumatic ejector to a discharge point.

26          l.    "Sanitary Sewer Overflow" or "SSO" means any overflow, spill,

27  release, discharge or diversion of untreated or partially treated wastewater from the

28  City Collection System.  SSOs include:  (i) Overflows or releases of untreated or

CONSENT DECREE                                        CV 11-03624 AGR

partially treated wastewater that reach waters of the United States; (ii) Overflows or releases of untreated or partially treated wastewater that do not reach waters of the United States; and (iii) Wastewater backups into buildings and on private property that are caused by blockages or flow conditions within the publicly owned portion of a sanitary sewer system.  For purposes of this Consent Decree, SSOs do not include overflows or releases of untreated or partially treated wastewater that reach the MS4 via the subsurface environment.  For purposes of this definition, "waters of the United States" has the meaning as set forth in 40 C.F.R. § 122.2 and as interpreted in applicable case law.

m.   "Sanitary Sewer Overflow Compliance Program" refers to the program identified in the City's 2011-2016 Capital Improvement Plan dated March 2010, as updated from time to time.

n.   "Sewer Line Segment" means any section of publicly owned sewer line or pipe located between: (1) two manholes/maintenance holes; (2) a pump station and a manhole/maintenance hole; (3) a pump station or a manhole/maintenance hole and a Headworks structure; or (4) a sewer line or pipe otherwise identifiable as a discrete section.

o.   "SSMP" means the Sewer System Management Plan developed by the City to manage, operate and maintain the City Collection System.  State Water Resources Control Board Order No. 2006-0003-DWQ, *Statewide General WDR For Wastewater Collection Agencies*, ¶¶ 5-11, D.13.

p.   "Year" will mean calendar year, unless otherwise specified.

### III.  JURISDICTION AND VENUE

3.   For purposes of settlement, the Parties stipulate to the Court's jurisdiction to enter and retain jurisdiction over the Parties to enforce the terms of this Consent Decree if necessary.

### IV.  EFFECT OF CONSENT DECREE

4.   Notwithstanding the General Objectives of this Consent Decree,

CONSENT DECREE

7

CV 11-03624 AGR

1 Channelkeeper does not, by its consent to this Consent Decree, warrant or aver in
2 any manner that the City's compliance with this Consent Decree will constitute or
3 result in compliance with any federal or state law or regulation.  This Consent
4 Decree is neither a permit nor a modification of existing permits under any federal,
5 state, or local law and in no way relieves the City of its responsibilities to comply
6 with all applicable federal, state and local laws and regulations.

7       5.      Nothing in this Consent Decree will be construed as an admission by
8 the City, and the City does not intend to imply any admission as to any fact, finding,
9 issue of law, or violation of law, nor will compliance with this Consent Decree be
10 construed as an admission by the City of any fact, finding, conclusion, issue of law,
11 or violation of law.

12       6.      Compliance with this Consent Decree resolves Channelkeeper's civil
13 claims for violations against the City, including all claims for civil penalties,
14 injunctive relief and attorneys' fees.

15 **V.  APPLICABILITY**

16       7.      The provisions of this Consent Decree apply to and bind the Parties,
17 including any successors or assigns.  The Parties certify that their undersigned
18 representatives are fully authorized to enter into this Consent Decree, to execute it
19 on behalf of the Parties, and to legally bind the Parties to its terms.

20       8.      The Parties agree to be bound by this Consent Decree and not to contest
21 its validity in any subsequent proceeding to implement or enforce its terms.  The
22 City does not admit liability for any purpose as to any allegation or matter arising
23 out of the Notice Letter, the Supplemental Letter, and/or Complaint or subsequent
24 incidents occurring during the term of this Consent Decree.

25       9.      No change in ownership or corporate or other legal status of the City or
26 any transfer of the City's assets or liabilities will in any way alter the responsibilities
27 of the City, or any of its successors or assigns, under this Consent Decree.

28       10.     In any action to enforce this Consent Decree, the City will not raise as a

---

CONSENT DECREE                                       CV 11-03624 AGR

defense the failure by any of its agents, servants, contractors, employees, and successors or assigns to take actions necessary to comply with this Consent Decree.

## VI.  EFFECTIVE DATE AND TERMINATION DATE

11.    The term "Effective Date" shall mean the Effective Date of this Consent Decree, which shall be the date on which the District Court enters the final Consent Decree.

12.    This Consent Decree will automatically and unconditionally terminate on March 31, 2017 ("Termination Date") unless the City seeks early termination of this Consent Decree pursuant to this paragraph.  The City may seek early termination of this Consent Decree if the City has no more than eight (8) SSOs per Year from the City Collection System in two consecutive calendar years.[1]

13.    The City shall initiate early termination by submitting a letter to Channelkeeper demonstrating that it has satisfied the conditions of early termination set forth in Paragraph 12.  Channelkeeper shall respond to the City's letter within twenty (20) days indicating whether it agrees with the City's contentions or request more information to determine whether to agree with the City's contentions.  If Channelkeeper agrees with the City's contentions, then the City shall prepare a joint motion for termination of this Consent Decree for Channelkeeper's review and signature.  Channelkeeper shall not unreasonably withhold its signature.  The City shall then file the joint motion for termination.  If Channelkeeper disagrees with the City's contentions or requests additional information, then the matter shall be subject to the Dispute Resolution provisions of Section XXV.

## VII.  SSO REDUCTION PERFORMANCE STANDARDS

14.    The City will reduce its SSOs to comply with the following SSO Reduction Performance Standards and will direct B&C to design its

---

[1] For purposes of calculating compliance with the early termination provisions of Paragraph 12, SSOs that satisfy the requirements set forth in Paragraph 14(b) will not be counted.

recommendations referenced herein to achieve said standards[2]:

        a.      Limitation on total SSOs per year:

        <u>Table 1</u>

| Calendar Year | Maximum Number of SSOs |
|---|---|
| 2012 | 18 |
| 2013 | 15 |
| 2014 | 12 |
| 2015 | 10 |
| 2016 | 8 |

        b.      For purposes of determining compliance with the SSO Reduction Performance Standards, SSOs caused by: (i) severe natural conditions (such as storm events exceeding a 10-Year 24-Hour Storm, hurricanes, tornadoes, earthquakes, tsunamis, and other similar natural conditions) or (ii) human-caused catastrophes (such as catastrophic fires or acts of terrorism) shall not be counted.

## VIII.  SSO REDUCTION ACTION PLAN

        15.     The City shall report any failure to meet the applicable SSO Reduction Performance Standard in each Annual Report required under Section XX of this Consent Decree.  In the event the City fails to meet the applicable SSO Reduction Performance Standard for any particular Year (as set forth in Table 1), the City shall prepare an SSO Reduction Action Plan designed to achieve compliance with the SSO Reduction Performance Standard set forth for the following calendar year, and submit it to Channelkeeper concurrently with the City's Annual Report.

---

[2] The Parties acknowledge that B&C may disclaim any warranty that implementation of its recommendations will achieve SSO Reduction Performance Standards and may thus include such disclaimers along with any recommendations, studies or reports submitted to the City.  Any such disclaimers by B&C shall not be considered a violation of this Consent Decree.

16.     The SSO Reduction Action Plan shall specify the actions taken in the Year for which the Annual Report was submitted that were designed to achieve compliance with the SSO Reduction Performance Standards, and shall specify additional measures to be taken during the upcoming Year and thereafter to achieve compliance with the SSO Reduction Performance Standards.  The SSO Reduction Action Plan shall include a proposed schedule for implementation of all actions proposed.

17.     If the City does not comply with SSO Reduction Performance Standards because of one or more SSOs for which the City had no feasible alternatives, based on reasonable engineering judgment, that it could have implemented to avoid the SSO(s), then the City's SSO Reduction Action Plan shall include an explanation to that effect and need not propose additional actions.

18.     Channelkeeper will review the Action Plan and submit comments, if any, on the Action Plan within thirty (30) days of receipt. The City shall consider Channelkeeper comments in good faith, and shall have fifteen (15) days from receipt of Channelkeeper's comments to either incorporate those comments into the Action Plan, or explain in writing why those comments were not accepted.  Disputes as to the adequacy of the Action Plan are to be resolved via Dispute Resolution as set out in Section XXV below.  Following agreement on, or resolution of any dispute regarding the SSO Reduction Action Plan, the requirements and terms of the SSO Reduction Action Plan shall become enforceable elements of this Consent Decree subject to Dispute Resolution provisions of Section XXV.

19.     The City may modify an SSO Reduction Action Plan as necessary to account for new information or changed circumstances.  The terms of any SSO Reduction Action Plan in place at the time the City seeks modification remain in effect until the modified Action Plan becomes effective.  To modify an SSO Reduction Action Plan, the City will provide Channelkeeper with a copy of the revised plan along with an explanation of the new information or changed

circumstances that necessitated the modification.  Channelkeeper will review the modified Action Plan and submit comments, if any, on the modified Action Plan within thirty (30) days of receipt.  The City shall consider Channelkeeper comments in good faith, and shall have fifteen (15) days from receipt of Channelkeeper's comments to either incorporate those comments into the modified Action Plan, or explain in writing why those comments were not accepted.  Disputes as to the adequacy of the Action Plan are to be resolved via Dispute Resolution as set out in Section XXV below.  Following agreement on, or resolution of any dispute regarding the modified SSO Reduction Action Plan, the requirements and terms of the modified SSO Reduction Action Plan shall become enforceable elements of this Consent Decree subject to the Dispute Resolution provisions of Section XXV.

## IX.  FATS, OILS AND GREASE PROGRAM

20.     The City shall continue to implement its existing residential and commercial FOG program pending implementation of program improvements recommended by B&C.  On or before July 31, 2012, the City shall cause B&C to assess the adequacy of the City's existing FOG program to reduce FOG related spills, and to prepare a FOG Program Plan.  The FOG Program Plan shall set forth B&C's recommendations for improvements to the City's FOG program to reduce the City's FOG related spills, including a brief cost benefit analysis comparing the cost and effectiveness of cleaning to FOG source control.  On or before December 31, 2012, the City shall implement the FOG Program Plan recommended by B&C.

## X.  SSO RESPONSE AND REPORTING PROGRAM

21.     Within thirty (30) days of the Effective Date, the City shall cause B&C to review and analyze the City's existing SSO response, record keeping, notification and reporting program and to prepare an updated SSO Response and Reporting Plan that incorporates B&C's recommendations for improvements to the City's SSO response program.  The updated SSO Response and Reporting Plan shall at a minimum require that the City:

CONSENT DECREE

CV 11-03624 AGR

a)      adopts a spill volume estimate methodology, and trains spill responders in its use and requires that spill responders use that methodology;

b)      accurately reports whether the spill reaches the MS4, and whether the MS4 is flowing;

c)      accurately reports the receiving water to which the spill is discharged, including spills to the MS4 which then discharge to a receiving water;

d)      accurately describes all spill response measures, including clean up, and spill cause;

e)      except for SSOs clearly caused by storm events exceeding a 10-Year 24-Hour storm, requires follow up CCTV inspection to further identify or confirm the cause of the spill, and identify an appropriate approach to prevent future spills from the same location;

f)      identifies all spills caused by roots entering the sewer main from laterals; and

g)       accurately notes rainfall at the time of the spill.

22.     The City shall implement the updated SSO Response and Reporting Plan within ninety (90) days of the Effective Date.

23.     Disputes as to the adequacy of the SSO Response and Reporting Plan shall be resolved via Dispute Resolution as set out in Section XXV below.

## XI.  SYSTEM-WIDE SEWER CLEANING AND ACCELERATED CLEANING PROGRAMS

24.     The City shall continue to clean all of its gravity Sewer Line Segments eighteen (18) inches in diameter or smaller in the City Collection System at least once every five (5) years.

25.     The City shall continue to include 4-month, 6-month, 12-month and 24-month cleaning frequencies in its Accelerated Cleaning Program.  The City shall include any Sewer Line Segment that has a blockage caused by roots, debris, grease or pipe condition in its Accelerated Cleaning Program; provided however, in the

1  event a Sewer Line Segment has been repaired, rehabilitated or replaced, or the
2  source of the materials causing the need for accelerated cleaning is eliminated, the
3  City may remove such Sewer Line Segment from the Accelerated Cleaning
4  Program.  The Accelerated Cleaning Program results will be maintained in the
5  City's CMMS system.

6       26.    Within thirty (30) days of the Effective Date, the City shall cause B&C
7  to review and evaluate the City's existing cleaning program and to recommend
8  improvements, and prepare a Cleaning Program Plan setting forth the recommended
9  cleaning program.  The Cleaning Program Plan shall address: cleaning methods,
10  strategies and procedures; methods, strategies and procedures for root control;
11  quality assurance quality control program; procedures for recording cleaning
12  findings; and methodology for changing cleaning frequency based on cleaning
13  findings.

14       27.    The City shall implement the Cleaning Program Plan within ninety (90)
15  days of the Effective Date.

16       28.    Disputes as to the adequacy of the Cleaning Program Plan shall be
17  resolved via Dispute Resolution as set out in Section XXV below.

18          **XII.  SEWER CONDITION ASSESSMENT**

19       29.    On or before July 31, 2012, the City shall cause B&C to develop a
20  CCTV and Condition Assessment Work Plan.  The Plan shall include a schedule for
21  assessing all of the Gravity Sewers in the City Collection System.  The condition of
22  each Sewer Line Segment inspected using CCTV shall be coded using the Pipeline
23  Assessment and Certification Program ("PACP") table attached as Exhibit A.

24       30.    Disputes as to the adequacy of the Condition Assessment Work Plan
25  shall be resolved via Dispute Resolution as set out in Section XXV below.

26       31.    On or before December 31, 2012, the City shall begin implementation
27  of the CCTV and Condition Assessment Work Plan, and shall implement pipe repair
28  and/or replacement as set forth in the PACP Coding matrix.

CONSENT DECREE                                           CV 11-03624 AGR

32.     On or before July 31, 2012, the City shall cause B&C to develop an inspection database to be incorporated into the City's CMMS system that documents the condition assessment rating for all Sewer Line Segments inspected pursuant to the City's CCTV and Condition Assessment Work Plan as described in Paragraph 29 above.

## XIII.  CAPACITY ASSURANCE

33.     On or before July 31, 2012, the City shall cause B&C or another qualified consultant to review the City's 2010 Master Plan prepared by Akel Engineering, the capacity assessment associated with the Master Plan, and any other appropriate documents, and to generate a Capacity Assurance Program.  The Capacity Assurance Program shall evaluate whether the City has adequate capacity to prevent capacity related SSOs from the Collection System during rain events up to and including a 10-Year 24-Hour Storm, recommend capacity assessment where appropriate, and prioritize and plan identified capacity projects sufficient to ensure adequate capacity to prevent spills up to the 10-Year 24-Hour Storm.

## XIV.  PUMP STATION AND FORCE MAIN
## CONDITION ASSESSMENT

34.     The City shall cause B&C to conduct a condition assessment of its pump stations and force mains to determine their overall capacity and reliability. On or before July 31, 2012, the City shall cause B&C to prepare a Pump Station and Force Main Condition Assessment Plan ("PSFM Plan").  The PSFM Plan shall identify and prioritize needed upgrades and/or repairs, including SCADA, back up generators, and/or capacity upgrades, and specify methods and a time schedule for performing future condition assessments of the City's pump stations and force mains.  On or before December 31, 2012, the City shall adopt and implement the PSFM Plan.

## XV.  DATABASE DEVELOPMENT

35.     Within two hundred and seventy (270) days of the Effective Date, the

City shall develop a database of pipe invert elevations or other verifiable and reliable information, such as as-built drawings, measurement of invert depths of manholes, or interpolation of invert elevations from reasonably close known invert elevations, which will allow the City to evaluate the relative depths of the sewer pipes in the entire City Collection System and separate storm sewer pipes in the City's entire MS4.  This database shall be used to identify High Risk Pipes as defined in Paragraph 42 below.

36.     Within thirty (30) days of the Effective Date, the City shall implement and maintain an updated CMMS system, linked to GIS, to record and track pertinent asset management, operations, and maintenance.  This information system shall be used to plan system operation and maintenance and capital improvement projects.

37.     Within thirty (30) days of the Effective Date, the City shall cause B&C to review and analyze the City Collection System pipe and manhole attribute data and identify any data gaps that are critical to the operation and maintenance of the City Collection System.  By July 31, 2012, the City shall cause B&C to develop a plan to populate the City's GIS and CMMS databases to address critical data gaps identified by B&C.  The City shall adopt and implement B&C's plan to populate the City's GIS and CMMs databases within one year of the Effective Date.

## XVI.  CAPITAL IMPROVEMENT PROJECTS

38.     The City shall continue its longstanding program of repair, rehabilitation, or replacement of one (1) percent of the City Collection System sewer mains per Year.  Specifically, the City shall repair, rehabilitate or replace a total of two and fifty-six hundredths (2.56) miles of sewer pipe each Year.  If the City repairs, rehabilitates or replaces more than two and fifty-six hundredths (2.56) miles in any Year, that additional length of pipe shall be credited to the City in the following Year(s).  Pipes repaired, rehabilitated, or replaced to satisfy this paragraph shall be exclusive of pipes repaired, rehabilitated, or replaced to satisfy Section XVII below.

39.     To comply with this Section, the City will prioritize for repair, rehabilitation or replacement any Sewer Line Segment or portion thereof identified in the Capacity Assurance Program, the Condition Assessment Program, the Cleaning Program, and/or the PSFM Program to be in need of repair, rehabilitation or replacement.  Such prioritization shall be consistent with B&C's recommendations and the PACP Table in Exhibit A.

40.     To comply with this Section, the City shall revise its CIP on an ongoing annual basis to include rehabilitation, repair or replacement projects, including but not limited to, projects identified in the Condition Assessment Program and PACP Table, the Capacity Assurance Program, the Cleaning Program, and the PSFM Program.

## XVII. EXFILTRATION

41.     The City shall develop and implement an Exfiltration Abatement Program.  The goal of this Program is to identify and prioritize for pipe rehabilitation, replacement or repair, those gravity sewer lines that have a high risk of leaking wastewater from the City Collection System to the MS4.

42.     As part of this Program, the City shall identify sewer segments meeting all of the following criteria: (i) sanitary sewer segments that are constructed of vitrified clay or reinforced concrete; (ii) sanitary sewer segments that cross above MS4 pipes or are above and within five (5) meters horizontally of MS4 pipes; (iii) sanitary sewer segments installed prior to 1991, or, for those installed since 1991, a condition assessment that identifies that the sanitary sewer segment has a crack, offset joint, or some other structural defect; and (iv) the sewer segments that are above the water table ("High Risk Pipes").  All sewer pipes in the City Collection System for which the City already possesses necessary information to evaluate using criteria (i)-(iv) of this paragraph shall be evaluated and designated as High Risk Pipes, as appropriate, within thirty (30) days of the Effective Date.  All other sewer pipes in the City Collection System shall be evaluated and designated High Risk

1    Pipes, or not, by June 30, 2013.

2        43.    The City shall repair, rehabilitate, or replace a total of two (2) miles of

3    High Risk Pipes each Year beginning in 2012.  High Risk Pipes in the Laguna

4    Watershed will be prioritized in 2012 using currently available age, material and

5    condition information and considering water quality data.  If the City repairs,

6    rehabilitates or replaces more than two (2) miles in any Year, that additional length

7    of pipe shall be credited to the City in the following Year(s).  The Parties understand

8    and acknowledge that, notwithstanding any provision to the contrary set forth

9    herein, the City shall not be required to spend more than nine hundred thousand

10   dollars ($900,000.00) to repair, rehabilitate or replace High Risk Pipes in any Year.

11   If, in any Year, the City expends less than nine hundred thousand dollars

12   ($900,000.00) to repair, rehabilitate or replace High Risk Pipes, the difference

13   between the amount spent that Year and nine hundred thousand dollars

14   ($900,000.00) [herein "Rollover Amount"] shall carry forward to the following Year

15   and the maximum amount the City may be required to spend pursuant to this Section

16   XVII in that Year shall be increased by the Rollover Amount.  For example, if in

17   Year 1 the City spends $800,000.00 to repair, rehabilitate or replace High Risk Pipes

18   pursuant to this Section XVII, the City may be required to spend up to

19   $1,000,000.00 to repair, rehabilitate or replace High Risk Pipes in Year 2; the

20   amount which is not spent in Year 2 will carry over to Year 3 and so on for each

21   Year until the Consent Decree terminates.  Upon the termination of the Consent

22   Decree any funds that remain from said Rollover Amount shall be deposited in the

23   Supplemental Collection System Sewer Pipe Rehabilitation Account.

24       44.    To ensure necessary information is available to prioritize High Risk

25   Pipes for repair, rehabilitation, and replacement, the City shall:

26            a.    Assess the condition of all High Risk Pipes using CCTV and

27   assign them a PACP grade by December 31, 2015;

28            b.    Evaluate water quality data in the prioritization of High Risk

CONSENT DECREE                                                CV 11-03624 AGR

1   Pipes, both for condition assessment and for repair, rehabilitation or replacement;

2          c.      Consider location of sewer pipes relative to the MS4 pipes.

3   Sewer pipes that cross above the storm sewer pipes shall be prioritized over those

4   sewer pipes that do not.

5          45.     Within ninety (90) days of the Effective Date, and thereafter by March

6   31 of each Year this Consent Decree remains in effect, the City shall submit an

7   Annual Exfiltration Abatement Program Plan to Channelkeeper.  The Annual

8   Exfiltration Abatement Program Plan shall be designed to eliminate the threat to

9   water quality from High Risk Pipes and shall:

10          a.      Describe the Exfiltration Abatement Program activities for the

11   preceding Year;

12          b.      Identify all storm sewer pipes and sanitary sewer pipes the City

13   considered to determine which sanitary sewer pipes are High Risk Pipes, which

14   High Risk Pipes the City considered for repair, rehabilitation and replacement, and

15   which of those the City intends to repair, rehabilitate or replace during that Year;

16          c.      Include an ESRI GIS Shapefile for the pipes identified in

17   subparagraph (b) above that contains the pipe ID number, upstream manhole

18   identifier, downstream manhole identifier, upstream and downstream invert

19   elevations, pipe age (for sanitary sewer pipes only), pipe material (for sanitary sewer

20   pipes only), pipe diameter, and whether the specific sanitary sewer pipe was selected

21   for repair, rehabilitation or replacement; and

22          d.      Describe how the factors listed in Paragraph 44 were used to

23   prioritize the pipes selected for repair, rehabilitation or replacement.

24          46.     Following the City's submission of the Exfiltration Abatement Program

25   Plan, and for every Year that the Consent Decree is in effect, the City will agendize

26   a City Council meeting for City staff to brief the City Council on the status of the

27   implementation of the Consent Decree.  Channelkeeper will be allowed up to twenty

28   (20) minutes each Year to present comments to the City Council in connection with

CONSENT DECREE

CV 11-03624 AGR

1  this agenda item.  The City will use this opportunity (1) to inform Chanelkeeper of
2  its proposed Plan and (2) to provide a summary of completed work undertaken
3  pursuant to this Consent Decree.

4       47.    Channelkeeper will review the Annual Exfiltration Abatement Program
5  Plan and submit comments, if any, on the Annual Exfiltration Abatement Program
6  Plan within thirty (30) days of receipt.  The City shall consider Channelkeeper
7  comments in good faith, and shall have fifteen (15) days from receipt of
8  Channelkeeper's comments to either incorporate those comments into the Annual
9  Exfiltration Abatement Program Plan, or explain in writing why those comments
10 were not accepted.  Disputes as to the adequacy of the Annual Exfiltration
11 Abatement Program Plan shall be resolved via Dispute Resolution as set out in
12 Section XXV below.

13 **XVIII.  SSMP**

14      48.    By August 31, 2012, the City shall cause B&C to revise the City's
15 SSMP to incorporate the improvements made to the City's sewer system asset
16 management program recommended by B&C and the requirements of Section XVII
17 of this Consent Decree.

18 **XIX.  CONSENT DECREE EXPENDITURES**

19      49.    Notwithstanding any provision to the contrary set forth herein, the City
20 shall not be required to spend more than five million one hundred thousand eight
21 hundred ninety-one dollars ($5,100,891.00) to comply with the terms of this
22 Consent Decree for each Year during the term of this Consent Decree, which
23 amount shall increase by one (1) percent per Year during the term of this Consent
24 Decree for purposes of inflation in accordance with Table 2 below [herein
25 "Expenditure Cap"].  The Expenditure Cap is exclusive of, and expressly does not
26 include, any funds the City may spend on the EE WWTP during the term of this
27 Consent Decree.  The Expenditure Cap shall also increase from year to year by any
28 Rollover Amount as discussed in Section XVII Paragraph 43 above.  If the City

CONSENT DECREE

CV 11-03624 AGR

20

does not meet the SSO Reduction Performance Standard for a given Year, the annual Expenditure Cap on the City's Consent Decree expenditures pursuant to this Paragraph shall increase by three (3) percent of the City Collection System Operating Budget for the following Year.

Table 2

| Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|--------|--------|--------|--------|--------|
| $5,100,891 | $5,151,900 | $5,203,419 | $5,255,453 | $5,308,008 |

## XX.  ANNUAL REPORT ON COLLECTION SYSTEM

50.    Beginning March 31, 2013, and by March 31st of each Year thereafter that this Consent Decree remains in effect, City shall submit an Annual Report to Channelkeeper.  The Annual Report shall provide details relevant to the City's implementation of, and compliance with, this Consent Decree during the preceding Year, including:

a.    A statement and explanation of the City's compliance or non-compliance with the SSO Reduction Performance Standard for the preceding Year;

b.    Any program modifications or delays during the preceding Year;

c.    CCTV inspection schedules in the upcoming Year for inspection of Gravity Sewers.

d.    A statement of:

i.    the miles of sewer that were assessed in the preceding Year;

ii.    the miles of sewer assessed receiving each grade in the PACP grading system;

iii.    a summary of the mileage and identification of sewers repaired, rehabilitated, and/or replaced during the preceding Year; and

e.    Identification of the sewer segments cleaned.

CONSENT DECREE

CV 11-03624 AGR

**XXI.  CHANNELKEEPER REVIEW OF CONSENT DECREE
DELIVERABLES**

51.    Channelkeeper may review and comment upon the Reports or
Programs required by this Consent Decree.  Channelkeeper will submit comments,
if any, on the Report or Program within thirty (30) days of receipt.  Unless provided
otherwise, the City shall consider Channelkeeper comments in good faith and shall
have twenty (20) days from receipt of Channelkeeper's comments to either
incorporate those comments into the Report or Program or explain in writing why
those comments were not accepted.

**XXII.  PAYMENT OF LITIGATION COSTS,
MONITORING OF CONSENT DECREE COMPLIANCE AND
SUPPLEMENTAL ENVIRONMENTAL PROJECT**

52.    To help defray Channelkeeper's attorneys, consultant, and expert fees
and costs, and any other costs incurred as a result of investigating, filing this action,
and negotiating a settlement, City shall pay Channelkeeper the sum of three hundred
thirty-seven thousand and five hundred dollars ($337,500.00), which shall include
all attorneys' fees and costs for all services performed by and on behalf of
Channelkeeper by its attorneys and consultants.  The payment shall be made within
ten (10) days of the Effective Date of this Consent Decree.  The payment shall be
made in the form of a check payable to "Lawyers for Clean Water Attorney Client
Trust Account" addressed to:  1004-A O'Reilly Avenue, San Francisco,
California 94129, sent overnight delivery, and except as specifically otherwise
provided in Paragraphs 53 and 65, shall constitute settlement for all costs of
litigation incurred by Channelkeeper that have or could have been claimed in
connection with or arising out of Channelkeeper's lawsuit, up to and including the
Termination Date.

53.    To compensate Channelkeeper for time to be spent by legal staff or
technical consultants reviewing compliance reports and monitoring City's
compliance with the terms of this Consent Decree, or participating in any Informal

1  Dispute Resolution under this Consent Decree, City shall pay Channelkeeper the

2  sum of Sixty-Five Thousand Dollars ($65,000.00).  Payment shall be made within

3  ten (10) days of the Effective Date of this Consent Decree, and shall be made

4  payable to "Lawyers for Clean Water Attorney Client Trust Account" addressed to

5  1004-A O'Reilly Avenue, San Francisco, California 94129, and sent overnight

6  delivery.

7       54.    <u>Supplemental Environmental Project</u>:  To mitigate perceived

8  environmental harms resulting from the allegations in the Complaint, the City shall

9  pay to the Watershed Management Group the total sum of One Hundred Twenty-

10  Five Thousand Dollars ($125,000.00) (herein "Mitigation Payment") to be used to

11  fund the Santa Barbara Green Living Co-op Low Impact Development ("LID")

12  Program.  The details and specifications of the LID Program are set forth in Exhibit

13  B.

14       55.    The Mitigation Payment shall be made within ten (10) days of the

15  Effective Date of this Consent Decree, shall be made payable to "Watershed

16  Management Group," and shall be sent via overnight delivery to:

17
18         Watershed Management Group
       P.O. Box 44205
       Tucson, Arizona 85733

19
20              **XXIII.  STIPULATED PENALTIES**

21       56.    Reports covered by this Section include: the Annual Report under

22  Section XX; the SSO Reduction Action Plan under Section VIII; the Capacity

23  Assurance Program under Section XIII;  the CCTV and Condition Assessment

24  Work Plan under Section XII; and the Annual Exfiltration Abatement Program

25  Plans under Section XVII.  For the first instance of delayed reporting, the City shall

26  have a fourteen (14) day grace period after the due date for the reports covered by

27  this Section prior to imposition of stipulated penalties.  Channelkeeper is not

28  obligated to notify the City after any submission date has been missed, however it

---

CONSENT DECREE

CV 11-03624 AGR

1  may do so in order to allow the City to promptly address any alleged deficiency.

2      57.    The City shall pay the following stipulated payments in the event that it

3  files a late report covered herein after the grace period:

4          a.    The City shall pay $100.00 per day until the report is filed, up to

5  thirty (30) days for a total amount of up to $3,000.00.

6          b.    For any report more than thirty (30) days late, the City shall pay

7  $3,000.00.

8          c.    For any report more than ninety (90) days late, the City shall pay

9  $5,000.00.

10

11         d.    The above penalties are cumulative, as applicable, to a maximum

12  penalty of $11,000.00 per report.

13     58.    In the event a required report is submitted late, Channelkeeper shall

14  notify the City of receipt of the late report and shall include an invoice for the

15  amount of the stipulated penalty, if any, due and payable.  The City shall contact

16  Channelkeeper within five (5) days if the City disagrees with Channelkeeper's

17  stipulated penalty calculation and may meet and confer with Channelkeeper or seek

18  Dispute Resolution pursuant to Section XXV.  The City shall pay any stipulated

19  payments due pursuant to this Consent Decree within thirty (30) days after receipt of

20  Channelkeeper's invoice itemizing the stipulated payment liability, or within thirty

21  (30) days after resolution of a dispute in favor of Channelkeeper if Dispute

22  Resolution has been invoked.

23     59.    All payments of stipulated penalties described above shall be paid by

24  the City via overnight mail to: the Watershed Management Group's Santa Barbara

25  Green Living Co-op Low Impact Development Program.  Nothing in this Consent

26  Decree shall prevent Channelkeeper from waiving any stipulated penalties which

27  might be due under this Section XXIII, based on the outcome of the Informal

28  Dispute Resolution (as defined in Paragraph 63 below) process or based on the

CONSENT DECREE                                              CV 11-03624 AGR

1   City's good faith efforts.

2   **XXIV.  SUBMISSION OF CONSENT DECREE FOR AGENCY REVIEW**

3         60.    Channelkeeper shall submit a copy of this Consent Decree to EPA and

4   the United States Department of Justice ("DOJ") within three (3) days of its

5   execution for agency review consistent with 40 C.F.R. § 135.5.  In the event that

6   EPA or DOJ comment negatively on the provisions of this Consent Decree, the

7   Parties agree to meet and confer to attempt to resolve the issue(s) raised by EPA or

8   DOJ.

9         61.    Within three (3) days of execution of this Consent Decree by the

10  Parties, Channelkeeper shall notify the Court of the Parties' tentative settlement

11  pending the review of the Consent Decree by DOJ and EPA required by 40 C.F.R. §

12  135.5.  Following the DOJ and EPA review period (and after the completion of the

13  meet and confer process referred to in the preceding paragraph, if any),

14  Channelkeeper will thereafter promptly request the Court to enter this Consent

15  Decree.

16  **XXV.  DISPUTE RESOLUTION**

17        62.    The Dispute Resolution procedures set forth in this Section shall be the

18  exclusive mechanism for resolving disputes between the Parties with regard to any

19  aspect of this Consent Decree.

20        63.    Either Party to this Consent Decree shall invoke the dispute resolution

21  procedures of this Section by notifying the other Party in writing of the matter(s) in

22  dispute and of the Party's proposal to resolve the dispute under this Section. The

23  Parties shall meet and confer in a good faith attempt to resolve the dispute

24  informally ("Informal Dispute Resolution") within thirty (30) calendar days from

25  the date of the notice.

26        64.    If the Parties cannot resolve a dispute within forty-five (45) calendar

27  days from the date of the notice as specified in Paragraph 63 above, the Party

28  invoking Informal Dispute Resolution may invoke formal dispute resolution

CONSENT DECREE

CV 11-03624 AGR

1  ("Formal Dispute Resolution") by filing a motion before the District Court.

2      65.    Litigation costs and fees incurred in Formal Dispute Resolution,

3  including an alleged breach of this Consent Decree, shall be awarded in accord with

4  the standard established by section 505 of the Clean Water Act, 33 U.S.C. § 1365,

5  and case law interpreting that standard.

6      **XXVI.  MUTUAL RELEASE OF LIABILITY AND FORCE MAJEURE**

7      66.    In consideration of the above, upon the Effective Date of this Consent

8  Decree, the Parties hereby fully release, except as expressly provided below, each

9  other and their respective successors, assigns, officers, agents, employees, elected

10  and appointed officials and all persons, firms, and corporations having an interest in

11  them, from any and all claims, known or unknown, based upon the facts alleged in

12  the Notice Letter, Supplemental Notice Letter, and Complaint.   Except for claims

13  for the City's failure to comply with this Consent Decree, Channelkeeper further

14  releases the City, and its successors and assigns, from any and all claims pertaining

15  to alleged SSOs or other releases of wastewater from the City Collection System

16  that may occur between the Effective Date and the termination of this Consent

17  Decree.

18      67.    Nothing in this Consent Decree limits or otherwise affects

19  Channelkeeper's right to address or take any position that it deems necessary or

20  appropriate in any formal or informal proceeding before the Regional Board, EPA,

21  or any other judicial or administrative body on any other matter relating to the City.

22      68.    Neither this Consent Decree nor any legal matter associated with this

23  Consent Decree will constitute or be construed as a finding, adjudication, or

24  acknowledgement of any fact, law, or liability, nor will it be construed as an

25  admission of violation of any law, rule, or regulation.  The City maintains and

26  reserves all defenses it may have to any alleged violations that may be raised in the

27  future.

28      69.    The City's obligation to comply with one or more of the provisions of

this Consent Decree will be deferred to the extent and for the duration that the delay in compliance is caused by impossibility due to an event or circumstances beyond the reasonable control of the City and that could not have been reasonably foreseen and prevented by the exercise of due diligence by the City.

70. Any delays due to the City's failure to make timely and bona fide applications, the City's failure to exercise diligent efforts to comply with the terms in this Consent Decree, or normal inclement weather, will not, in any event, be considered to be circumstances beyond the City's control.

71. If the City claims impossibility, it will notify Channelkeeper in writing within thirty (30) days of the date that the City first knew of the event or circumstance that caused or would cause a delay in compliance with this Consent Decree, or the date the City should have known of the event or circumstance by the exercise of due diligence. The notice will describe the reason for the nonperformance and specifically refer to this Section of this Consent Decree. It will describe the anticipated length of time the delay may persist, the cause or causes of the delay, the measures taken or to be taken by the City to prevent or minimize the delay, the schedule by which the measures will be implemented, and the anticipated date of compliance. The City will adopt all reasonable measures to avoid and minimize such delays. If Channelkeeper disagrees with the City's notice, or in the event that the Parties cannot timely agree on the terms of new performance deadlines or requirements, either Party will have the right to invoke the Dispute Resolution procedures pursuant to Section XXV of this Consent Decree.

## XXVII.  NOTICES AND SUBMISSIONS

72. Any notifications, submissions, or communications to Channelkeeper or to the City pursuant to this Consent Decree will be, to the extent feasible, sent via electronic mail transmission to the e-mail addresses listed below (electronic return receipt requested) or, if electronic transmission is not feasible, via U.S. Mail or hand delivery to the following addresses. Any change in the individuals or addresses

designated by any Party must be made in writing to all Parties, but the Parties stipulate and agree that the Parties need not amend this Consent Decree to effectuate a change in the notice recipients.

If to CHANNELKEEPER:

Santa Barbara Channelkeeper
Kira Redmond, Executive Director
714 Bond Avenue
Santa Barbara, CA 93103
Telephone:  (805) 563-3377
Facsimile: (805) 687-5635
Email: kira@sbck.org

Drevet Hunt
Lawyers for Clean Water, Inc.
1004 O'Reilly Avenue
San Francisco, CA 94129
Telephone: (415) 440-6520
Email: drev@lawyersforcleanwater.com

If to the CITY:

City of Santa Barbara
735 Anacapa Street
City of Santa Barbara, CA 93101
Telephone: (805) 564-5305
Facsimile: (805) 897-1993
Email: JArmstrong@SantaBarbaraCA.gov

Attn: City Administrator

City of Santa Barbara
630 Garden Street
City of Santa Barbara, CA 93102
Telephone: (805) 564-5378
Facsimile: (805) 897-2613
Email: CAndersen@SantaBarbaraCA.gov
Attn: Public Works Director

City of Santa Barbara
Post Office Box 1990
Santa Barbara, CA 93102-1990

Telephone: (805) 564-5332
Facsimile: (805) 897-2532
Email: SKnecht@SantaBarbaraCA.gov
Attn: Sarah Knecht

Gregory Newmark
Meyers, Nave, Riback, Silver & Wilson
633 West 5th Street, Suite 1700
Los Angeles, CA 90071
Telephone: (213) 626-2906
Facsimile: (213) 626-0215
Email: gnewmark@meyersnave.com

73.     Notices submitted in accordance with this Section will be deemed submitted on the date they are postmarked or, if sent electronically, they will be deemed submitted upon transmission, but a notice is not effective if the sending Party learns that it did not reach the Party to be notified.  Notwithstanding the sender's receipt of a successful delivery notification, a recipient that fails to receive the submission may request delivery by other means.  Such a request does not affect the timeliness of the original submission.

74.     The City also agrees to provide to Channelkeeper any new or existing final technical reports or documents within the City's custody or control that are reasonably necessary to confirm City Collection System performance and/or compliance with this Consent Decree within thirty (30) days of written request by Channelkeeper.

75.     During the life of this Consent Decree, the City will preserve at least one legible copy of all records and documents, including computer-stored information, which memorializes performance of its obligations under this Consent Decree.

## XXVIII.  GENERAL PROVISIONS

76.     <u>Continuing Jurisdiction</u>.  The Parties stipulate that the District Court will retain jurisdiction to enforce the terms and conditions of this Consent Decree

and to resolve disputes arising hereunder as may be necessary or appropriate for the construction or execution of this Consent Decree up to and including the Termination Date in Section VI above.

77.     <u>Construction</u>.  The language in all parts of this Consent Decree will be construed according to its plain and ordinary meaning, except as to those terms defined in Section II above.

78.     <u>Choice of Law</u>.  The laws of the United States will govern this Consent Decree.

79.     <u>Counterparts</u>.  This Consent Decree may be executed in any number of counterparts, all of which together will constitute one original document.  Telecopy, scanned copies (i.e., pdf) and/or facsimile copies of original signature will be deemed to be originally executed counterparts of this Consent Decree.

80.     <u>Modification of the Consent Decree</u>.  This Consent Decree, and any provisions herein, may not be changed, waived, discharged, or terminated unless by a written instrument, signed by the Parties.

81.     <u>Full Settlement</u>.  This Consent Decree constitutes a full and final settlement of this matter.

82.     <u>Integration Clause</u>.  This is an integrated Consent Decree.  This Consent Decree is intended to be a full and complete statement of the terms of the agreement between the Parties and expressly supersedes any and all prior oral or written agreements, covenants, representations, and warranties (express or implied) concerning the subject matter of this Consent Decree.

83.     <u>No Third Party Beneficiaries</u>. This Consent Decree does not confer upon any person other than the Parties any rights or remedies hereunder.

84.     <u>Authority</u>.  The undersigned representatives for Channelkeeper and the City each certify that he/she is fully authorized by the Party whom he/she represents to enter into the terms and conditions of this Consent Decree.

The Parties hereby enter into this Consent Decree.

CITY OF SANTA BARBARA

Date: March 22, 2012          /s/ Marcelo A. Lopez
                              By:   Marcelo A. López
                              Assistant City Administrator

APPROVED AS TO FORM:

Date: March 22, 2012          /s/ Sarah J. Knecht
                              By:   Sarah J. Knecht
                              Assistant City Attorney

                              SANTA BARBARA
                              CHANNELKEEPER:

Date: March 22, 2012          /s/ Kira Redmond
                              By: Kira Redmond
                              Executive Director

APPROVED AS TO FORM:

Date: March 22, 2012          /s/ Daniel Cooper
                              By: Daniel Cooper
                              Lawyers for Clean Water, Inc.
                              Counsel for Channelkeeper

**IT IS SO ORDERED**

Date: May 14, 2012_____  _Alicia G. Rosenberg_____
                              Hon. Alicia G. Rosenberg
                              Magistrate Judge of the United States
                              District Court for the Central District of
                              California

**Exhibit A**

**PACP Table**

| Observed Defect | Corrective Action | Time Frame (from date defect observed) | Other Action |
|---|---|---|---|
| PACP Grade 4 or 5 Maintenance Defect | Clean sewer | 30 days | Place on preventive cleaning or root control schedule as appropriate |
| PACP Grade 3 Maintenance Defect | Clean sewer | 4 months | Place on preventive cleaning or root control schedule as appropriate |
| PACP Grade 5 Structural Defect – Immediate Failure Likely | Repair or rehabilitate sewer | ASAP (no more than 90 days)[3] | N/A |
| PACP Grade 5 Structural Defect – Immediate Failure Unlikely | Repair, rehabilitate, or re-inspect sewer | 2 years | Reinspect within one year if corrective action not taken |
| PACP Grade 4 Structural Defect | Repair, rehabilitate, or re-inspect sewer | 5 years | Reinspect within three years if corrective action not taken |

---

[3] In the event a permit or permission from a third party is required to repair or rehabilitate the Sewer Line Segment, the City shall diligently pursue such permit or permission and that work shall occur within no more than ninety (90) days of obtaining the necessary permits or permission.

CONSENT DECREE

CV 11-03624 AGR

## Exhibit B

### Supplemental Environmental Project

### Santa Barbara Green Living Co-op Low Impact Development Program

The funds provided by the Consent Decree will be used to support the Santa Barbara Green Living Co-op Low Impact Development Program ("LID Program"), administered by the Watershed Management Group.

The Green Living Co-op is based on the barn-raising model, where people volunteer their labor to build sustainable systems and then earn the ability to host a workshop at their own home with a volunteer crew. In Santa Barbara, the Co-op provides certified workshop leaders to its members with expertise in the following areas: rainwater harvesting, green infrastructure, and watershed restoration. Co-op members who host workshops at their home pay for materials and other workshop costs. The Santa Barbara Co-op was launched in January 2011; it currently has more than fifty members, and offers free presentations and workshops to the public. The program's webpage announces the latest workshops and educational activities, as well as signup for free membership; to learn more, visit: http://watershedmg.org/co-op/santa-barbara. Communication with Santa Barbara Green Living Co-op can be directed to:

> Barbara Wishingrad
> PO Box 22506,
> Santa Barbara CA 93121
> Telephone: 805-403-4566,
> bwishingrad@watershedmg.org

**PROJECT DESCRIPTION**

The LID Program will identify willing Santa Barbara property owners to participate in retrofit projects to establish low impact development ("LID") demonstration sites in Santa Barbara. Participants will work with the Santa Barbara Green Living Co-op to design and install LID features on their properties. LID features include earthworks to create rain gardens and stormwater infiltration basins; rain water harvesting strategies such as roof downspout disconnects; and graywater systems. The LID Program in Santa Barbara will include:

- workshops and outreach through the Santa Barbara Green Living Co-op;
- the creation of LID/green infrastructure demonstration sites in Santa Barbara;

- professional trainings on water harvesting and green infrastructure; and
- a series of site tours upon completion to showcase the projects and raise awareness and interest in LID in the wider Santa Barbara community.

Over the course of the next two years, the LID Program is expected to include 30 to 40 (and shall include no less than 20) hands-on workshops to implement 30 to 40 (and not less than 20) residential demonstration projects, including rain gardens, in the Santa Barbara community. The funds provided will be used for $500 to $1,000 subsidies to workshop hosts in the Santa Barbara Co-op, with first priority given to those with financial need.

With the funds provided, the LID Program should also result in the creation of at least 2-3 LID/green infrastructure demonstration sites in Santa Barbara. Sites to be selected will open to the public to visit, and WMG is committed to monitoring and maintaining the site for the long-term.

In addition, implementation of the LID Program include professional trainings in green infrastructure and water harvesting to ensure more Santa Barbara professionals have the skills to design and implement these practices. The funds will allow us to bring in leading experts to teach the course and offer scholarships to Santa Barbara residents to make the trainings affordable.

Our Santa Barbara Program Manager will continue to offer free educational presentations to the public and expand our presentations to offer sessions in Spanish to reach a more diverse demographic. A series of site tours will be conducted once demonstration gardens and sites are completed. Outreach, including site tours and educational presentations, will ensure the public learns about the Co-op, the free, educational workshops, and financial subsidies.

**PROJECT COSTS**

WMG expects to spend approximately $75,000 during the first year, and approximately $50,000 during the second year of the LID Program. Overall, the LID Program funds are expected to be spent as follows:
- Green Living Co-op workshops & demonstration gardens: ~$62,500
- LID/green infrastructure demonstration sites: ~$25,000
- Water harvesting and green infrastructure professional training: ~$20,000
- Public Outreach and Education: ~$17,500

For reference, the typical costs of a sample residential demonstration garden and a

LID/green infrastructure demonstration site are provided in the tables below.

**Sample cost for residential demonstration rain garden**

| Materials - plants, mulch, rock, etc. | $400 |
|---|---|
| Staff Time | $800 |
| Contractor – excavating | $750 |
| Project Administration | $195 |
| Total | $2,145 |

*Some of these costs will be covered through the settlement funds and some will be covered by the workshop host.

**Sample cost for green infrastructure demonstration site, commercial site**

| Materials - plants, mulch, rock, signage | $2000 |
|---|---|
| Staff Time | $5600 |
| Contractor – excavating, gutters, and curb cuts | $2500 |
| Project Administration | $1010 |
| Total | $11,110 |

**PROJECT DELIVERABLES**

The WMG will provide the following deliverables to track its progress and ensure completion of the LID Program:

- A progress report by June 30, 2013, detailing project accomplishments and funds spent.
- A final report after the project is completed by June 30, 2014, detailing project accomplishments and certifying that all funds have been expended on the project.

1789649.11